ELLIS, Judge
(dissenting).
Chester Melder, Jr., a Correctional Officer I, and Murphy F. Whitmore, Prison *234 Hospital Technician III, were discharged from their employment at Louisiana State Penitentiary by the Warden on June 23, 1961. The assigned cause for dismissal of each was “insubordination and disloyalty of such a nature as to be disruptive, highly demoralizing and detrimental to the operations of this institution.” The specific acts of disloyalty and insubordination assigned by the Warden were the following:
“1. Shortly after the present board of institutions took office on or about July 25, 1960, there was circulated among some of the members ^of this Board namely: Mr. J. L. Walker, Mr. Chester Green and Mr. Leo L. Ehrhard an anonymous and unsigned document highly critical of the State Penitentiary at Angola and of the Warden and other personnel, a copy of which is annexed hereto and made a part hereof.
“2. This document was likewise circulated to other parties including some members of the Legislature.
“3. Following the circularization of this document, and to a large extent because of it, a sub-committee of the Board of Institutions composed of Messrs. E. A. Lee, Sr., E. C. Thompson, M. C. Peck, Albert Gallinghouse and Leo L. Ehrhardt conducted an investigation into the operations of the State Penitentiary, said investigation having commenced on the 3rd day of October, 1960, and having been completed on the 10th day of October, 1960.
“4. Thereafter an investigation into the operations of the penitentiary was likewise made by a special Committee appointed by the Governor composed of Messrs. J. C. Gilbert, Davis W. Folkes, Lantz Womack, T. J. Strother, W. C. Teen, Jr., Marion Roy, James R. Leake, Walter P. Clark, and Frank J. Altmyer, which investigation commenced on the 15th day of March, 1961, and was concluded on or about the 23rd day of March, 1961.
“5. In both of the aforementioned investigations, it was admitted by you that you were a co-author of the document hereto attached, and responsible for its distribution.
“6. The writing and distribution of this unsigned anonymous document by you constituted the grossest type of insubordination, disloyalty and misconduct of such a nature as to be highly detrimental to the efficiency of the service.
“7. It is manifest from a reading of this document that its purpose was to disrupt the normal operations of the penitentiary and was motivated by the malicious intent on your part to bring about, if possible, radical changes in the personnel, policy and practices of the State Penitentiary more satisfactory and convenient to your purposes.
“8. The distribution of this document was made by you surreptitiously and in complete disregard of normal administrative channels and processes available for the lodging and investigation of such complaints.
“9. Pretermitting the truth or falsity of the contents of said documents, your action as aforesaid constitutes sufficient cause for your dismissal for the above stated grounds and reasons.”
The appellants appealed their discharge to the Civil Service Commission where the matter was heard on August 9, 1961 and the Commission, on September 29th, 1961, dismissed both appeals with two members dissenting, whereupon appeals were perfected to this court.
We are cited the well-settled law that where a decision of the Civil Service Commission is based on evidence it is not the province of the Court on appeal to determine the weight or sufficiency of the evidence, as this is a question of fact which the Commission has the exclusive right to determine. King v. Department of Public Safety, 236 La. 602, 108 So.2d 524; Cotting- *235 ham v. Department of Revenue, 232 La. 546, 94 So.2d 662; Leggett v. Northwestern State College, La.App., 132 So.2d 715.
The entire question before this court at this time is whether there was any evidence before the Civil Service Commission sustaining the general charge of insubordination and disloyalty of such a nature as to be disruptive, highly demoralizing and detrimental to the operation of the Penitentiary. The truth or falsity of the contents of the document of which the appellants were the authors and which served as a basis for their dismissal was specifically eliminated as a cause of their discharge in the letter written by the Warden.
I have carefully considered the record, the majority and dissenting opinions in this case and am in thorough accord with the dissenting opinions of Commissioners Rivet and Dennery that there is no evidence to support the cause assigned for dismissal of insubordination and disloyalty of such a nature as to be disruptive, highly demoralizing and detrimental to the operation of the Penitentiary. The dissenting opinions fully cover the question at issue and in my opinion correctly hold that there is no evidence to support the specific charge for dismissal of these appellants and that they should be returned to their respective positions in the Civil Service of the State without prejudice, and I therefore adopt as my dissenting opinion, the dissenting opinions of Commissioners Rivet and Dennery and quote:
“Commissioner Charles J. Rivet, Dissenting:
“It is rare that I find myself under compulsion to dissent from the findings of fact and conclusions of the majority of the members of this Commission. I must dissent in these consolidated cases else I would subscribe to propositions and findings of fact based on mere assumptions, unsupported by evidence, contrary to the universally recognized rule that in any proceeding that is judicial in nature, whether in a court or in an administrative agency,, the process of' decision must be governed by the. basic principle that nothing must be taken into account in arriving at a determination that has not been introduced into the record. Fundamentals of procedural due process require that there be evidence to support pertinent findings of fact of a Commission, and that its conclusions rest upon such proper findings. (Cf. Morgan v. U. S., 298 U.S. 468, 480, 56 S.Ct. 906, 911 [80 L.Ed. 1288]).
' “In their findings of fact, referring to a document authored by appellants and made part of the notice of discharge, the majority say that they can take NOTICE ‘that the contents of the document were gathered and reduced to writing during a period which coincided with the campaign and election of the Governor and other State officers * * If such were a fact, I don’t know that it would have any bearing on the issues, but I can find nothing in the notice of discharge or in the evidence that would support that finding. On the contrary, the notice of discharge (beyond which no evidence is admissible) alleges no earlier action by appellants than July 25, 1960, at which time no campaign for the gubernatorial office was in progress.
“The majority did not make a finding of fact that the activities of appellants resulted in an impairment of the proper administration of the Penitentiary, nor could they have properly made such finding as there is nothing in the record to support such. Nevertheless, in their conclusions, the majority express the opinion that ‘the record amply supports the conclusion that appellants’ activities resulted in an impairment of the proper administration of the Penitentiary.’ Apparently conscious that nothing would be found in the record to justify that conclusion, the majority proceeds to disclose that their opinion is founded on hypothesis as to what they deem natural human reactions.
“The majority profess to be mindful ‘of the Constitutional guarantees of freedom of speech, publication and expression of *236 opinion’; and declare that 'these Constitutional rights are restricted by the laws of libel and defamation for their abuse and, in case of public employees, by dismissal if such publications, expressions or utterances impair the proper administration of the public service.’ That pronouncement is supported by no citation of authority, and laborious search has failed to reveal to me any authoritative source for its support. So far as I have been able to discover, it is the mere ipse dixit of the majority, and I find it in conflict with the views expressed by the Supreme Court of the United States in the Bridges and Times-Mirror cases ([Bridges v. State of California] 314 U.S. 252, 62 S.Ct. [190] 193 [86 L.Ed. 192]) and those of the Supreme Court of Louisiana in: Graham v. Jones, et al. In re Times-Picayune [Pub. Co.], (7 So.2d 688, 200 La. 137), and in other cases. In the Jones case the court found certain newspaper editorials to be contemptuous acts; declared that the mere reading thereof would convince any impartial mind that the language goes far beyond fair and reasonable criticism; was aimed at intimidation and tended materially to affect the orderly administration of justice; and were clearly contempts of the court. Yet, the Court held itself powerless to punish the perpetrators because of the holding of the United States Supreme Court in the cases mentioned.
“Long prior to Graham v. Jones the Supreme Court of this State recognized that one may print and circulate what he pleases, even if libelous, but subject to be held liable therefor. Levert v. Daily States Pub. Co., 49 So.2d 206 [23 L.R.A.,N.S., 726] 123 La. 594. And, subsequent to Graham v. Jones, it struck down an ordinance prohibiting cluttering of streets with trash as unconstitutional if applied to one disseminating political literature or material advocating particular ideologies as a prohibited restraint upon guaranties of freedom of speech and press. N[ew] O[rleans] v. Hood, 212 La. 485, 32 So.2d 899.
“The freedom of speech guaranteed by the Federal and State Constitutions consists in 'the right to publish, with impunity, truth, with good motives, and for justifiable ends, whether it respects government, magistracy, or individuals.’ It does not free from responsibility those who in the exercise thereof indulge in blasphemy, obscenity, or scandal, or who by falsehood and malice injuriously affect the standing, reputation, or pecuniary interests of others. (Cf. Kennedy v. Item Co., 213 La. 347, 34 So.2d 886.)
“The majority appear to have confused the Constitutional prohibition against restriction of free speech, with the legality of imposing penalties for the abuse of the privilege. In the instant case it cannot be found that appellants have abused the privilege as the question of the verity vel non of their printed utterances is not at issue. If the appellants have in fact abused their privilege of free expression there are laws and other tribunals to bring them to account. This Commission has no jurisdiction to determine that appellants have done so. They were not discharged for publishing falsehoods. Their employing authority makes no charge that any of their statements are untrue. On the contrary, he 'pre-termits’ the verity vel non thereof, which in effect means that regardless of whether what they have said is true or false he discharged them because they dared to exercise rights accorded them by the Constitution of the United States and of the State. Compare the views expressed on rehearing by the Supreme Court of the State in the Brickman case ([Brickman v. New Orleans Aviation Board] 263 [236] La. 143, 107 So.2d 422).
“The law presumes that persons act in good faith. The burden of proving the contrary rests upon the party who alleges it. If there is doubt, it is to be resolved in favor of good faith. Wherefore, unless the writing is libellous per se, it is essential in a petition for libel to aver that the writing was untrue and written with knowledge of its falsity, and the defendant in such action is entitled to be informed regarding what part or parts of the statement are *237 asserted to be false. Cf. Dickinson v. Hathaway, 48 South. 136, 122 La. 244; Martin v. Markley, 11 So.2d 593, 202 La. 291. I do not pause to determine which of the assertions in the document are libelous per se, and which are libellous per quod. The only purpose of such would be to determine which party carries the burden of proving the truth or falsity of the utterances. Since verity vel non was deliberatively eliminated from this case and falsity is not made a cause for the discharge, the Commission is without jurisdiction of that issue.
“The majority recognizes in the closing portion of the first paragraph of their ‘Conclusions’ that they are not concerned with the verity or falsity of the utterances. Nevertheless they conclude that ‘great weight’ must be given to the conclusions of the Board of Institutions that certain employees should be disciplined by termination of their employment and say that the Board’s view is positive indication of the specious nature of at least some of the statements and accusations in the circulated document. (This conclusion is drawn despite the majority’s finding of fact that the Board of Institutions gave no names or identification of the employees to whom they intended to refer.)
“I cannot determine from the majority opinion the ‘cause’ which they found sufficient to affirm the discharge of these appellants. Unless the ‘cause’ sustained by the Commission as sufficient for discharge is clearly expressed, it is impossible for a reviewing tribunal to determine whether there exists that real and substantial relation between the assigned cause and the employee’s ability to perform his duties, required for a lawful discharge. (Cf. Cottingham v. Dept. of Rev., 94 So.2d 662, 232 La. 546; In re Johnston, Docket No. 240).
“The Constitution does not define ‘Cause’, but in Domas v. Div. Emp. Sec. Dept. Labor (227 La. 490, 501, 79 So.2d 857, 860) the Supreme Court of Louisiana approved the definition of ‘cause’ as given by this Commission (Docket No. 3), viz: ‘By “cause” is meant legal cause relating to and affecting the administration of an office or the duties of a position, and it must be restricted to some act of a substantial nature directly affecting the public interest.’ And, in the Cottingham case, cited supra, the Court held that in the absence of a real and substantial relation between the assigned cause and the employees conduct or ability to perform his duties, the action of a Commission in upholding his removal would itself be arbitrary and subject to annulment as a matter of law.
“In the instant case, not only is there a total absence of evidence to establish that the writing and circulating of the document under discussion adversely affected the administration of the penitentiary, the duties of appellants’ positions, or the public interest, but, on the contrary, the majority’s findings of fact show that as late as March 31, 1961, appellant Whitmore’s services still merited an outstanding rating, and those of M elder a fair rating.
“This Commission is under duty to determine for itself in every case whether a valid cause existed in fact for the discharge of a civil service employee. It is not sufficient that the Commission find that the employing authority had before it sufficient evidence to justify the latter’s action. The Commission must have evidence before it sufficient to support its own conclusion that there was legal cause for the discharge. Mayerhafer v. Dept. of Police, City of N[ew] Orleans], 104 [So.]2d 163, 235 La. 437.
“I cannot eke out of the evidence before the Commission any basis for finding a valid cause for the discharge of the appellants. I do not find that the acts charged against appellants did in any way adversely affect the public service, or performance by appellants of the duties of their respective positions. It is not the prerogative of this Commission to decide whether appellants acted in good or bad taste, nor can a conclusion of valid discharge be based upon a determination that the employees’ conduct *238 failed to meet the Commission’s standards of good taste.
“I am of the opinion that no legal cause has been shown of record for the discharge of these appellants. They should be returned to their respective positions in the civil service of the State, without prejudice.
“s/ Chas. J. Rivet.”
“Commissioner Moise W. Dennery dissenting :
“I agree with Commissioner Rivet’s dissent. I cannot agree with the majority view that this ‘record amply supports the conclusion that the appellants’ activities resulted in an impairment of the proper administration of the penitentiary.’ To the contrary, as Commissioner Rivet has pointed out, there is not a word in the record that would justify such a conclusion.
“The majority opinion seems to me to be based upon what I believe to be the erroneous conclusion that ANY action by a public employee which could ‘tend to create dissension, unrest and dissatisfaction’ among other employees, or which ‘would tend to undermine the confidence’ of a newly appointed official in his subordinates, or which could lead to an investigation of the employee’s superiors, constitutes cause for dismissal. I cannot agree that this is correct; certainly if all of the statements contained in the document circulated by these employees had been true, their actions would not serve as a proper cause for dismissal.
“Since the letter of dismissal specifically pretermits the truth or falsity of the statements circulated by these employees, and since we are given no opportunity to determine their veracity, I would order the appellants reinstated to the positions they, respectively, occupied prior to the effective date of the letters of June 23, 1961, with full restoration of all their legal rights.
“s/ Moise W. Dennery.”
The basis of the majority opinion appears to be that “The writing and distribution qf the unsigned [anonymous document] which was made a part of the letters of discharge, constituted the grossest type of insubordination, disloyalty and misconduct * * * of such a nature as to be highly detrimental to the efficiency of the service. * * *” and that “The contents of the [letter] the manner in which it was prepared and distributed [makes it manifest to us] that these employees intended to disrupt the normal operations of the penitentiary and were motivated by the malicious intent to bring about, if possible, radical changes in the personnel, policy and practices of the State Penitentiary more satisfactory and convenient to their purposes.” The majority concluded that “This is insubordination, pure and simple.”
In the beginning, it is well to understand the exact meaning of the word “insubordination” which is defined in Black’s Law Dictionary as follows:
“Insubordination: state of being insubordinate; disobedience to constituted authority.
“Refuse to obey some order which a superior officer is entitled to give and have obeyed.
“Insubordination by a servant imparts a wilful disregard of express or implied directions of the employer and refusal to obey reasonable orders.”
Also, the word “disloyalty” is defined in the same authority as “not true to — unfaithful — uncooperative.”
Bearing in mind the above definitions I would like to briefly review the facts as shown by the record on the hearing before-the Commission.
The appellants belonged to an employees union at Angola and they went to the Warden with two complaints, which were really constructive criticisms for they were later-corrected as suggested by these appellants, and after the Warden had read them he threw them back to them with an unprintable remark as to- what they could do with them. They then went to Mr. Wm.. *239 F. Ruff, III, who was the Personnel Director of the Department of Institutions, with the same suggestions and they were given no satisfaction from him, although he admitted that later these suggestions were put into effect at the Penitentiary. In view of the fact that so much has been made over the failure of these appellants to follow, in filing their complaints or suggested corrections to be made at the Penitentiary, the “Department of Institutions, Policy and Procedures Manual, Employees Relations Code” which is contained on seven pages in small sized type, or the “Louisiana State Penitentiary, Rules and Regulations, General Order No. 2” put out on November 3, 1958, it is significant to note that when they went to the Warden the first time and then to Mr. Ruff, III, the Personnel Director, neither of these gentlemen advised them to file their complaints in accordance with either one of the above rules and regulations. It is also shown in this record that the Warden did not even know if these regulations had ever been put on the Bulletin Board, nor could anyone swear that these two appellants had ever been furnished with a copy of these so-called rules and regulations. It is interesting also to note Rule 13 of General Order No. 2 which states:
“Matters relating to the discipline or management of the Penitentiary may not be discussed in the presence of inmates. If anyone desires to offer any constructive criticism or advice, these will be welcomed and will be heard at any time by the Warden, Associate Warden, Security Chief, or other administrative personnel. However, such matters when discussed in the presence of inmates may have an adverse affect upon the Penitentiary program.”
There is not one word in this record and it is not even suggested that these appellants violated the rule with regard to talking to inmates about the affairs of the Penitentiary which they thought should be corrected and which are listed in the document filed before the Department of Institutions. When they went to the Warden and Mr. Ruff III they did exactly what the rules said they should do. They also went to the grievance committee with the same result. Thereafter, together with some 25 other union member employees at the Penitentiary, the document which the majority Commission and this Court have held on its face proves the charge “of insubordination and disloyalty of such a nature as to be disruptive, highly demoralizing and detrimental to the efficiency of the operations of this institution * * *” was prepared by the cooperation of all. The appellants were the representatives of the group and this document was given to five people: Representative Alford, Mr. Green and Mr. Ehrhardt, who were members or appointees to the membership of the Board of Institutions, a copy to Representative Munson of West Feliciana Parish which is the location of the Louisiana State Penitentiary, and the fifth copy was given to Dr. George Azar of Baton Rouge, Louisiana, who did surgery work at times in the Penitentiary and with whom the appellants had discussed the affairs of the Penitentiary which they thought needed correcting, and he had asked that they prepare a document along those lines. Had they prepared this document and given it to the press and scattered it to the four winds, one might think they were maliciously attempting to disrupt the affairs of the Penitentiary. It was apparently very discreetly handled. At least, there is not one line of testimony that anyone at the Penitentiary was upset or the affairs disrupted by this document. It is most interesting to note that the truth or falsity of the contents of the document were entirely and purposely pretermitted in arriving at the cause for discharge of these appellants. There is nothing in this record as to whether the Department of Institutions considered the truth or falsity of the contents of the document. In addition, there was a Legislative Committee investigation and there is nothing in the record as to the outcome of that investigation bearing upon the truth or falsity of the charges or suggested changes that should be *240 made in the operation of the affairs of the penitentiary. It is most significant, however, that this record shows that most all of the suggestions contained in that document were corrected after the investigation. As remarked by one of the Commissioners, this on its face shows that the appellants were guilty of no malicious intent. In addition, there is no showing that anyone named in that document, either as being an alcoholic or being intoxicated on the job, ever took any action.
The failure to go into the truth and veracity of the document was the most effective means of preventing proof of the truth. The failure to make it an issue killed it.
The warden testified that neither one of these appellants had ever refused to take orders from him or to carry out any instructions given to them. In addition, Murphy F. Whitman, for the period from May 23, 1957 to March 31, 1961, was given a certificate for outstanding service rating and also a standard rating report which stated that he had performed the duties of his job in a manner which met or exceeded the standards established by the Department for his position. There are other documents in which he was referred to as an outstanding employee of the institution. Chester A. Melder also' received practically the same awards and letters from the rating officials.
There is nothing in this record to show that the Warden’s action in discharging these appellants was fully voluntary. As a matter of fact, he received a copy of a resolution from the June 22, 1961 minutes of the Board of Institution which practically ordered him to take disciplinary action against “certain employees of the Penitentiary for acts of insubordination and disloyalty that in the opinion of the Board will warrant the termination of these employees * * The record does not show any reason for not taking the same disciplinary action against the other members of the employees union who assisted in the preparation of the document.
In my opinion, the document itself does not convict the appellants of the charge for which they were dismissed, and taking all of the testimony in the case, it fails to show any act of insubordination or disloyalty, shows an absolute lack of malicious intent, is devoid of any evidence that would reveal any purposes to further appellants’ positions or change the positions of others, and by the correction of almost all of the conditions which the appellants charged existed, revealed the truth of such charges and the necessity for correction of such conditions and, in my opinion, the appel-ants should be restored to their respective positions as prayed for.
The punishment which these appellants have received will probably forever foreclose any future criticism by honest employees to better conditions in the Louisiana State Penitentiary or reveal injustices, incompetency, favoritism or the like.
For the above and foregoing reasons, I respectfully dissent.